IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.  13-cv-03472-REB-MJW

JANET JOHNSTON and
MARY CLAY,

Plaintiffs,

v.

THE CITY OF COLORADO SPRINGS, a Colorado municipality,

Defendant.

---

### RECOMMENDATION ON
### DEFENDANT'S PARTIAL MOTION TO DISMISS SECOND AMENDED COMPLAINT AND JURY DEMAND (Docket No. 25)

---

**MICHAEL J. WATANABE**
**United States Magistrate Judge**


This case is before this court pursuant to an Order Referring Case issued by

Judge Robert E. Blackburn on January 6, 2014.  (Docket No. 6).

In the Second Amended Complaint (Docket No. 20-2),[1] both plaintiffs, Janet

Johnston and Mary Clay, raise claims of disparate treatment, hostile work environment,

and retaliation based on age in violation of the Age Discrimination in Employment Act

("ADEA"), 29 U.S.C. § 621, et seq., and the Colorado Anti-Discrimination Act ("CADA"),

§ 24-34-301, C.R.S., et seq. (Claims One, Two, Five, and Seven).  In addition,

---

[1]Plaintiffs filed an Amended Complaint on March 18, 2014.  (Docket No. 19).
Two days later, they filed a Notice of Plaintiffs' Amendment of Complaint and Jury
Demand by Witten [sic] Consent of Defendant (Docket No. 20) with a Second Amended
Complaint and Jury Demand With Strikes and Underlines (Docket No. 20-1) and a
Second Amended Complaint and Jury Demand (Docket No. 20-2).

2

Johnston brings claims of disparate treatment, hostile work environment, and retaliation based on disability in violation of  Americans with Disability Act ("ADA"), 42 U.S.C. § 1211, et seq., and CADA (Claims 9 and 10), and based on gender in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 (e-5g)-, et seq. ("Title VII"), and CADA (Claims Three and Six).  Clay also brings claims of disparate treatment, hostile work environment, and retaliation based on race in violation Title VII and CADA (Claims Four and Eight).

At the time that pleading was filed in March 2014, Clay (an African American female) was 53 years old, and Johnston (a Caucasian female) was 58 years old.  For over 25 years, Clay has been working for an enterprise of the defendant City of Colorado Springs (Colorado Springs Utilities) that provides electricity, water, wastewater, and gas services.  Johnston worked there from June 7, 2004, until December 15, 2012, when she claims she was constructively discharged.

Now before the court for a report and recommendation is Defendant's Partial Motion to Dismiss Second Amended Complaint and Jury Demand (Docket No. 25), in which it seeks to dismiss: (1) all CADA claims filed by both plaintiffs pursuant to Fed. R. Civ. P. 12(b)(1); (2) Johnston's failure to promote to Energy Support Services Manager and numerous alleged acts of retaliation pursuant to Rule 12(b)(1); (3) some of Clay's allege retaliatory acts pursuant to Rule 12(b)(1); (4) all hostile work environment theories alleged by both plaintiffs pursuant to Rule 12(b)(6); (5) Johnston's constructive discharge claim pursuant to Rule 12(b)(6); and (6) Johnston's alleged demotion to Supervisor of Sales and Load Forecasting, her level 1 corrective performance discussion, her 2007 performance evaluation, and threats of termination as time-barred

pursuant to Rule 12(b)(6).  (Docket No. 25 at 2).  Plaintiffs filed a Response (Docket No. 31) and a Notice of Supplemental Authority (Docket No. 36),  and defendant filed a Reply (Docket No. 37).

In the Response, plaintiffs state that they consulted with defendant and would file a Motion to Voluntarily Dismiss their CADA claim with prejudice.  (Docket No. 31 at 1).  Plaintiffs, however, have not yet done so, but given their apparent confession of the motion to dismiss the CADA claim, it is recommended that such claim be dismissed with prejudice, and the court will not further address defendant's first argument enumerated  above.

Furthermore, in the Response, Johnston also concedes that she is not pursuing the disparate treatment and retaliation claims that defendant asserts are time barred.  Therefore, the court will not address defendant's argument with respect to those claims (#6 enumerated above).

Rule 12(b)(1) concerns whether the court has jurisdiction to hear the case before it.  It:

> empowers a court to dismiss a Complaint for "lack of jurisdiction over the subject matter."  Fed. R. Civ. P. 12(b)(1).  As courts of limited jurisdiction, federal courts may only adjudicate cases that the Constitution and Congress have granted them authority to hear.  *See* U.S. CONST. art. III, § 2; *Morris v. City of Hobart*, 39 F.3d 1105, 1110 (10th Cir. 1994).  Statutes conferring jurisdiction on federal courts are to be strictly construed.  *See F & S Constr. Co. v. Jensen*, 337 F.2d 160, 161 (10th Cir. 1964).  A Rule 12(b)(1) motion to dismiss "must be determined from the allegations of fact in the complaint, without regard to mere conclusory allegations of jurisdiction."  *Groundhog v. Keeler*, 442 F.2d 674, 677 (10th Cir. 1971).  The burden of establishing subject matter jurisdiction is on the party asserting jurisdiction.  *See Basso v. Utah Power & Light Co.*, 495 F.2d 906, 909 (10th Cir. 1974).

Motions to dismiss pursuant to Rule 12(b)(1) may take two forms.

4

> First, if a party attacks the facial sufficiency of the complaint, the court must accept the allegations of the complaint as true. *See Holt v. United States*, 46 F.3d 1000, 1002-03 (10th Cir. 1995). Second, if a party attacks the factual assertions regarding subject matter jurisdiction through affidavits and other documents, the court may make its own findings of fact. *See id.* at 1003. A court's consideration of evidence outside the pleadings will not convert the the motion to dismiss to a motion for summary judgment under Rule 56. *See id.*

Cherry Creek Card & Party Shop, Inc. v. Hallmark Marketing Corp., 176 F. Supp.2d 1091, 1094-95 (D. Colo. 2001).

A motion to dismiss pursuant to Rule 12(b)(6) alleges that the complaint fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Under Rule 8(a)(2), a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "A complaint must be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) if it does not plead 'enough facts to state a claim to relief that is plausible on its face.'" Cutter v. RailAmerica, Inc., 2008 WL 163016, at *2 (D. Colo. Jan. 15, 2008) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007)). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, . . . a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . ." Bell Atlantic Corp., 550 U.S. at 555 (citations omitted). "Factual allegations must be enough to raise a right to relief above the speculative level." Id. "[A] plaintiff must 'nudge [] [his] claims across the line from conceivable to plausible' in order to survive a motion to dismiss. . . . Thus, the mere metaphysical possibility that *some* plaintiff could prove *some* set of facts in support of the pleaded claims is insufficient;

the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims." Ridge at Red Hawk, L.L.C. v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007) (quoting Bell Atlantic Corp., 127 S. Ct. at 1974).

The Tenth Circuit Court of Appeals has held "that plausibility refers to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs have not nudged their claims across the line from conceivable to plausible." Khalik v. United Air Lines, 671 F.3d 1188, 1191 (10th Cir. 2012) (internal quotations omitted).  The Circuit court has further "noted that '[t]he nature and specificity of the allegations required to state a plausible claim will vary based on context.'" Id.  The court thus "concluded the *Twombly/Iqbal* standard is 'a wide middle ground between heightened fact pleading, which is expressly rejected, and allowing complaints that are no more than labels and conclusions or a formulaic recitation of the elements of a cause of action, which the Court stated will not do.'" Id.

For purposes of a motion to dismiss pursuant to Rule 12(b)(6), the court must accept all well-pled factual allegations in the Amended Complaint as true and resolve all reasonable inferences in the plaintiff's favor.  Morse v. Regents of the Univ. of Colo., 154 F.3d 1124, 1126-27 (10th Cir. 1998); Seamons v. Snow, 84 F.3d 1226, 1231-32 (10th Cir. 1996).  However, "when legal conclusions are involved in the complaint 'the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to [those] conclusions' . . . ." Khalik, 671 F.3d at 1190 (quoting Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009)).  "Accordingly, in examining a

complaint under Rule 12(b)(6), [the court] will disregard conclusory statements and look only to whether the remaining, factual allegations plausibly suggest the defendant is liable." Id. at 1191.

## Exhaustion

Exhaustion of administrative remedies is a jurisdictional prerequisite to suit under the ADEA, ADA, and Title VII. Apsley v. Boeing Co., 691 F.3d 1184, 1210 (10th Cir. 2012) (Title VII and ADA); Shikles v. Spring/United Mgmt. Co., 426 F.3d 1304, 1317 (10th Cir. 2005) (ADEA). "As the party invoking federal jurisdiction, Plaintiff[s] [have] the burden of establishing that jurisdiction is proper." Weise v. Eisai, Inc., 2012 WL 84701, at *2 (D. Colo. Jan. 11, 2012). Here, defendant asserts that plaintiffs did not include many of their retaliatory acts and disparate treatment claims in their EEOC Charges, and, therefore, based upon their failure to exhaust administrative remedies, this court lacks subject matter jurisdiction over these acts and claims. This court agrees with defendant's arguments.

In determining whether a plaintiff has exhausted her administrative remedies, the court must "determine the scope of the allegations raised in the EEOC charge because '[a] plaintiff's claim in federal court is generally limited by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination submitted to the EEOC.'" Jones v. United Parcel Serv., Inc., 502 F.3d 1176, 1186 (10th Cir. 2007) (quoting MacKenzie v. City and County of Denver, 414 F.3d 1266, 1274 (10th cir. 2005)). "In other words, the charge must contain facts concerning the discriminatory and retaliatory actions underlying each claim . . . ." Id. "[E]ach discrete incident of alleged discrimination or retaliation constitutes its own unlawful employment

practice for which administrative remedies must be exhausted." Green v. Donahoe, 760 F.3d 1135, 1140 (10th Cir. 2014) (quoting Jones, 502 F.3d at 1186) (internal quotation marks omitted). "Exhaustion serves the dual purposes of 'protect[ing] employers by giving them notice of the discrimination claims being brought against them' and 'providing the EEOC . . . with an opportunity to conciliate the claims.'" Id. (quoting Foster v. Ruhrpumpen, Inc., 365 F.3d 1191, 1195 (10th Cir. 2004)).

Here, Johnston asserted the following in her Charge of Discrimination dated August 18, 2011 (846-2011-75171):

I.     I was hired on June 2, 2004 as a Senior Forecasting Analyst in the Planning and Finance Division and my current position is Supervisor of Sales and Load Forecasting.

II.    In early June, 2011 I applied for an open job position of Financial Forecasting Reporting and Budgeting Manager, which would have been a promotion. On or about July 1, 2011, I found out that I was not granted an interview. The position was given to a male employee who is under the age of 40.

III.   I feel that I have been discriminated against because of my Sex (Female) in violation of Title VII of the Civil Rights Act of 1964, as amended; also because of my Age (d.o.b. [redacted in copy filed with court]) in violation of the Age Discrimination in Employment Act of 1964 (ADEA), as amended and in retaliation, in asmuchas [sic];

a)     I have performing all the duties of my job in a satisfactory manner and I have no documented performance deficiencies.

b)     I believe that the reason I was not even interviewed for the position is discriminatory because I have a Masters Degree in Business Administration with emphasis on finance which together with my extensive work experience exceed the minimum qualifications for the position I applied for.

c)     In 2007 I filed an internal complaint against Bill Cherrier who was the General Manager of Finance at the time. After filing the internal

complaint, Mr. Cherrier retaliated against me by giving me an undeserved *level 1 performance discussion* and my one and only ever *"developing" performance evaluation*, which was also undeserved. I brought my concerns of retaliation to the attention of the CFO, Edward Easterlin and afterwards, Mr. Cherrier's retaliation stopped. Mr. Cherrier has since been promoted to CFO of the Planning & Finance Division. In this role of CFO, Mr. Cherrier is the final decision maker in the hiring process for the Planning & Finance Division. I feel that Mr. Cherrier is abusing his current position of power to retaliate against me by denying me this promotion opportunity.

d)      The successful candidate for the Financial Forecasting Reporting and Budgeting Manager position was Steve Berman. Mr. Bergman [sic] and Angela Mora, who are both under the age of 40, were "groomed" to take-over the position. They were both given "special projects" with additional pay, where they would be able to supervise a couple of people and thus, be able to show this management experience (which was less than one year) on their applications.

e)      I believe that Colorado Springs Utilities has a pattern or practice of promoting predominantely [sic] male employees under the age of 40.

f)      I feel that I and other employees similarly situated are discriminated against because of our sex or age.

(Docket No. 25-1).

Thereafter, in an Amended Charge of Discrimination received on December 28,

2012 (541-2013-00470), Johnston alleged:

Claimant was subjected to disparate discipline and adverse action(s) and was de facto demoted, ostracized and denied promotions and employment privileges and subjected to a hostile work due to her age (over 50), her gender (female), her disability (stress-related illness due to discrimination) and in retaliation for her ongoing protected activity (EEOC Complaint 846-2011-75171filed August 2011). Younger male employees were treated more favorably in promotions, job duties, evaluations responsibilities, special projects and meetings and workload than Complainant and Complainant reported the disparate treatment to both her supervisor and upper management officials.

A). Date: 1/28/12 and continuing:

9

On 1/27/12 Complainant amended her ongoing EEOC complaint 846-2011-75171, filed August 2011 to add a complaint that her younger male supervisee was given preferable tasks in economic development, which had been her tasks.  Complainant was given lower-level tasks and an increased workload intended to impair and which did impair her ability to perform.  Complainant set forth a detailed analysis of the need for hiring of another employee to help with the lower level tasks but was denied an extra employee, even though other male supervisor comparators were given extra employees with the same or less need for help.

From 1/28/12 and continuing Complainant has continued to be removed from responsibilities commensurate with her job title and these responsibilities were given to a younger male supervisee.  Complainant has been shut out of meetings she should be attending which she has attended in the past as part of her responsibilities.  Those meetings were with the CEO and her supervisor, but her younger male supervisee is going to those meetings and the male is having one-on-ones with the supervisor and the CEO; and, although Complainant has asked to be included, Complainant was been [sic] denied the opportunity.

On April 12, 2012 Complainant was given a performance evaluation in which she was given a low evaluation score in communications, which was a pretextual criticism, as Complainant has given presentations and engaged throughout her employment in extensive and superior communications.  This evaluation was made possible because the CEO, who was the discriminatory official for her August 2011 EEOC Complaint, revised the evaluation system so that he and other division managers could rank Complainant as a team.  The evaluation will deny Complainant a raise for the year.

Complainant has continued since 1/28/12 to apply for lateral job transfers or promotions and has been denied those jobs throughout 2012, which were given primarily if not entirely to younger males.

On November 11, 2012 the male supervisee was invited to attend a meeting with city auditors for forecasting, which is Complainant's job.  Complainant tried to attend and was not permitted to attend at that time.

The de facto demotion and denial of job promotions and denial of responsibility and contact with management officials and her supervisor have created a hostile work environment which has caused Complainant to have anxiety, heart condition, stress and depression, for which she took FMLA leave in July, 2012, only to have increased hostility directed toward her after she took the leave in July, 2012 and on other occasions.

(Docket No. 25-2).

Next, in a Charge of Discrimination dated May 27, 2013, and filed on June 10,

2013 (541-2013-01644), Johnston asserted:

> Complainant wishes to add a new claim of discrimination **for constructive discharge**; which occurred on December 14, 2012 when she resigned from her employment at Colorado Springs Utilities after she learned that the young male she supervised, Matt Dudden, was attending meetings with her supervisors and mangers [sic] that she should have been attending.  She knew then that Mr. Dudden, who had for some time been systematically given her duties and responsibilities, was going to take over her job and she knew she was going to be terminated.

> Complainant resigned over duress from slowly losing her job, from isolation and from the health effects of a heart condition, stress, depression and migraine headaches caused by the de facto demotion and loss of job duties she had endured since she filed an EEOC case in August 2011, Case # 846-2011-75171 and 541-2-13-00470 in November, 2012.

> In those complaints she described being subjected to disparate discipline and adverse action(s) and was de facto demoted, ostracized and denied promotions and employment privileges and subjected to a hostile work due to her age (over 50), her gender (female), her disability (stress-related illness due to discrimination) and because of her ongoing protected activity (EEOC Complaint 846-2011-75171 filed August 2011). Younger male employees were treated more favorably in promotions, job duties, evaluations responsibilities, special projects and meetings and workload than Complainant and Complainant reported the disparate treatment to both her supervisor and upper management officials.

(Docket No. 25-3).  She stated the Basis of Complaint as:

> A).   Date: 12-14-2012:

> Constructive Discharge based on gender, age, disability and retaliation for engaging in protected activities when she filed EEOC Complaints Case # 846-2011-75171 and 541-13-00470 in 2011 and 2012.

> On 1/27/12 Complainant amended her ongoing EEOC complaint 846-2011-75171, filed August 2011 to add a complaint that her younger male supervisee was given preferable tasks in economic development, which had been her tasks.  Complainant was given lower-level tasks and an

11

increased workload intended to impair and which did impair her ability to perform. Complainant set forth a detailed analysis of the need for hiring of another employee to help with the lower level tasks but was denied an extra employee, even though other male supervisor comparators were given extra employees with the same or less need for help.

From 1/28/12 and continuing Complainant has continued to be removed from responsibilities commensurate with her job title and these responsibilities were given to a younger male supervisee. Complainant has been shut out of meetings she should be attending which she has attended in the past as part of her responsibilities. Those meetings were with the CEO and her supervisor, but her younger male supervisee is going to those meetings and the male is having one-on-ones with the supervisor and the CEO; and, although Complainant has asked to be included, Complainant was been [sic] denied the opportunity.

On April 12, 2012 Complainant as given a performance evaluation in which she was given a low evaluation score in communications, which was a pretextual criticism, as Complainant has given presentations and engaged throughout her employment in extensive and superior communications. this evaluation was made possible because the CEO, who was the discriminatory official for her August 2011 EEOC Complaint, revised the evaluation system so that he and other division managers could rank Complainant as a team. The evaluation will deny Complainant a raise for the year.

Complainant has continued since 1/28/12 to apply for lateral job transfers or promotions and has been denied those jobs throughout 2012, which were given primarily if not entirely to younger males.

On November 11, 2012 the male supervisee was invited to attend a meeting with city auditors for forecasting, which is Complainant's job. Complainant tried to attend and was not permitted to attend at that time.

The de facto demotion and denial of job promotions and denial of responsibility and contact with management officials and her supervisor have created a hostile work environment which has caused Complainant to have anxiety, heart condition, stress and depression, for which she took FMLA leave in July, 2012, only to have increased hostility directed toward her after she took the leave in July, 2012 and on other occasions. She resigned on December 14, 2012 in a constructive discharge because she knew she was gong to be terminated and her health was failing because of that threat.

(Docket No. 25-3).

12

Plaintiff Clay's Charge of Discrimination, dated August 9, 2011 (541-2011-

01916), states:

> I was denied equal terms and conditions of employment (special assignment pay) in/around December 2010 and was denied promotion to Lead Project Manager position in June 2011.  I filed an internal discrimination complaint in July 2011 and have been subjected to retaliatory harassment ever since.

> I believe I have been discriminated against based on my race (black) and age (51) and that I am being retaliated against for my opposition to discriminatory practices, in violation of Title VII of the Civil Rights Act of 1964, as amended, and the Age Discrimination in Employment Act of 1967, as amended insomuch as:

> The Respondent identified a need to replace its budgeting software systems during fiscal year 2009. I was one of two full time employees in the Budget Office that worked on this project - my supervisor was the other employee.  We formed the cross functional team and, soon afterward, full project control was delegated to me.  I created and wrote the business case for which I later received a congratulatory message from the Dede Jones (General Manager of Financial Services).  I worked with procurement, legal, and information technology to evelop [sic] the contract, statement of work, initial project plan and all the foundational elements needed to get the project underway.  In/around December 2010, I requested special assignment pay for this role.  Dede Jones denied my request.

> In comparison, I was treated differently and less favorably than Angelia Mora (white/30's).  Dede Jones gave Angelia the opportunity to supervise and lead our department's financial and forecasting activities.  I was not aware of this opportunity for special assignment nor was it posted.  Unlike me, Angelia was approved for special assignment pay which started receiving in January 2011.

> In June 2011, I was denied promotion to a Lead Project Management position that I had been performing since 2009.  Dede Jones selected Steve Berman (white/30's) for this position even though he had never done the job.  Shortly afterward, another promotional opportunity was posted in June 2011 - this time for a Financial Forecasting and Budgeting Manager position.  I met all the qualifications for that position but was not interviewed.  Dede Jones (the selecting official) chose Steve Berman for the position.  Steve was selected despite having only 5 years of utilities experience.  The job posting stated that the successful candidate would

likely have at least 8 years of progressive experience in the energy and utilities industry.

On July 27, 2011, I filed an internal discrimination complaint with the Human Resources department.  Steve Berman has been harassing me ever since I filed my discrimination complaint.  He has been monitoring my attendance and performance more closely than my coworkers and he asked me to open and give access to a Budget Consolidations folder where I store all my work.  I had to inform him that his request is not considered a "best practice" because it could cause problems if anyone made changes to the models that I store in that folder.  On August 5, 2011, Steve Berman informed me that another employee was taking over the Administrator functions that I previously performed with the Budget System.  I believe that Steve Berman took these actions to retaliate against me and to harass me for filing my discrimination complaint.

(Docket No. 25-4).

With regard to the issue of exhaustion of administrative remedies, this court finds as follows.  First, a review of Johnston's EEOC Charges shows that she did not include in those Charges the allegation she makes in the Second Amended Complaint that she did not receive an interview for the position of Energy Support Services Manager in January  2011 (Docket No. 20-2 at 6 ¶¶ 29-30).  Her first EEOC Charge (Docket No. 25-1, Def.'s Exhibit A) merely alleged a failure to promote to the Financial Forecasting Reporting and Budgeting ("FFRB") Manager position.  Her second and third EEOC Charges (Docket Nos. 25-2 and 25-3, Def.'s Exhibit B and Exhibit C) alleged only failures to promote in 2012.  Therefore, this court lacks subject matter jurisdiction over Johnston's claim concerning a failure to promote to the Energy Support Services Manager position in 2011, and such claim should be dismissed without prejudice.

Next, defendant asserts that the Second Amended Complaint also alleges numerous discrete acts of disparate treatment and retaliation that were not asserted in plaintiffs' EEOC Charges, and thus they have not exhausted administrative remedies

for these acts under their age, sex, or disability theories of disparate treatment or retaliation claims.  [For Johnston: (Docket No.. 20-2 at 29 ¶ 244 (First Claim), 32 ¶ 260 (Third Claim), at 35-36 (Fifth Claim), at 36-37 (Sixth Claim), at 41 ¶¶ 312-13 (Ninth Claim), at 42-43 (Tenth Claim); For Clay: (Docket No. 20-2 at 29 ¶ 242; at 31 ¶ 253 (Second Claim); at 33-34 ¶¶ 269, 271 (Fourth Claim); at 38-39 (Seventh Claim); at 40-41 (Eighth Claim)].  Defendant details these alleged unexhausted acts of disparate treatment and retaliation, and plaintiffs have responded with respect to each of these acts, as outlined below.

With regard to Johnston:

Acts Nos. 1 to 5: The first five allegedly unexhausted acts are:  (1) Bill Cherrier ("Cherrier") attacked Johnston's forecasting work in front of others (Docket No. 20-2 at 12 ¶ 77); (2) Cherrier reduced Johnston's presentation time (Docket No. 20-2 at 12 ¶ 78); (3) Cherrier changed Johnston's base forecasts without consulting her (Docket No. 20-2 at 12 ¶ 79-81); (4) Cherrier demanded more accuracy in Johnston's work and questioned her forecast accuracy (Docket No. 20-2 at 13 ¶ 90); and (5) Stella Chan ("Chan") and Cherrier were critical of Johnston and scrutinized her work (Docket No. 20-2 at 15 ¶ 102).  Johnston responds that her facts meet the exhaustion requirements because they reasonably grew out of her EEOC allegation of negative performance evaluations and her allegation that Cherrier was "abusing his position of power to retaliate against her."  (Charge 1, p. 2, first paragraph).  In addition, she notes that she filed an amendment to Claim 1 on January 27, 2012, describing in paragraph six: "I am being set up for failure as a continuation of the retaliation that I have experienced due to my complaint," and in paragraph seven to eight she described that her forecasting

group continued to be criticized and told to become more accurate.  Johnston further notes that she made various allegations in her Rebuttals to Position Statement.

Act No. 6:  The alleged sixth unexhausted act is Human Resources telling Johnston she must follow company policies regarding transfers (Docket No. 20-2 at 15 ¶ 103).  Johnston responds that this allegation is related to her statement in Charge 2 (p.2 ¶ 4) in which she complains that she cannot get a transfer because the jobs are given to younger males.

Acts Nos. 7 to 10:  Defendant lists alleged unexhausted acts seven through ten as follows:  (7) Cherrier scowled at Johnston in meetings, avoided looking at her, and told her to "deliver an angry message" to Chan; (Docket No. 20-2 at 17 ¶¶ 126-127); (8) Cherrier avoided Johnston in 2012 by delivering communications through someone else, not looking at her, not stopping by her desk, and not talking to her (Docket No. 20-2 at 18 ¶ 129); (9) Cherrier angrily told another employee he wanted information from Johnston and Matt Dudden ("Dudden") and threatened to have them work over the weekend (Docket No. 20-2 at 18 ¶ 130); and (10) Johnston was subjected to threats of termination (Docket No. 20-2 at 30 ¶ 246).  Johnston responds that these allegations are reasonably related to Charge 2 (p. 1 ¶ 1) where she complains of being shut out of meetings she should be attending which she has attended in the past as part of her responsibilities.  In addition, she references statements she made in her Rubuttal to Position Statement for Charge 2 and her Rebuttal to Charge 1.

With regard to Clay:

Act No. 1:   The first allegedly unexhausted act is when Berman threatened to terminate Clay once he became the FFRB Manager (Docket No. 20-2 at 23-24 ¶¶ 183,

185, 187-190; at 29 ¶ 240; at 31 ¶ 253).   Clay responds that she raised this claim in an Attachment to her Charge - CSU Case History A, p. 4, ¶ 3; and that she also reported the threat of termination in a letter to the EEOC dated October 23, 2011, to which she attached the CSU Investigations of Discrimination and Retaliation.   (Pl.'s Ex. 9, Investigative Findings Retaliation Case, p. 6, § Allegation 1 and Findings).

Acts Nos. 2 and 5:   The second and fifth allegedly unexhausted acts listed by defendant are: (2) Berman set a meeting for Clay at 8:00 a.m. (Docket No. 20-2 at 27 ¶ 221) and (5) Berman assigned Clay a project when the Budget consolidation was scheduled which caused her to stay late (Docket No. 20-2 at 28 ¶¶ 228-29).   Clay responds that these acts were contained in the Internal Retaliation Investigation that she provided to the EEOC Investigator.   (Pl.'s Ex. 9, Investigative Findings Retaliation Case, p. 6, Allegation 2 C).

Acts Nos. 3, 4, 6, 7, and 8:   The five remaining allegedly unexhausted acts listed by defendant are: (3) Clay was assigned "ad hoc" job duties in August 2011 (Docket No. 20-2 at 27 ¶ 225); (4) Berman removed Clay's lead analyst duties (Docket No. 20-2 at 28 ¶¶ 227, 232); (6) Clay's job duties became less strategic and more administrative (Docket No. 20-2 at 28 ¶¶ 231, 235); (7) Berman changed Clay's reporting relationship (Docket No. 20-2 at 28 ¶¶ 233-34); and (8) Clay transferred to another department "after she no longer had work to perform" (Docket No. 20-2 at 28 ¶ 236).   Clay responds that these allegations are reasonably related to her Charge in which she alleged on August 5, 2011, she learned that another employee was taking over the Administrator functions she previous performed.   (Pl.'s Ex. 8, EEOC Charge, p. 2, ¶ 3; Pl.'s Ex. 9).   Plaintiff also references the Internal Retaliation Investigation that she provided to the

EEOC Investigator.  (Pl.'s Ex. 9, Investigative Findings Retaliation Case, p.7 ¶ D and E and p. 7 Findings D & E).

As noted above, with respect to some of these alleged acts, plaintiffs assert that they "reasonably grew" out of or were "related to" allegations they made in their EEOC charge.  The "reasonably related" test, however, has effectively been overruled by the Supreme Court, and the test now is that each act must be separately exhausted.  See Eisenhour v. Weber County, 744 F.3d 1220, 1227 (10th Cir. 2014) (citing National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 122 (2002); Martinez v. Potter, 347 F.3d 1208, 1210-11 (10th Cir. 2003)).  As also noted above, plaintiffs also point to documents outside of their Charges and amendments thereto, i.e., Johnston references her Rebuttals to Position Statements and her Rebuttal to Charge 1; Cray references her Attachment to her Charge - CSU Case History, a letter to the EEOC dated October 23, 2011, to which she attached the CSU Investigations of Discrimination and Retaliation, and an Internal Retaliation Investigation that she provided to the EEOC Investigator.

The court has reviewed these documents in conjunction with the EEOC Charges. Based upon that review, the court agrees with defendant in its assertion that other than the EEOC Charges, the court cannot consider such extraneous documents in its administrative exhaustion analysis.  The court is guided by the unpublished Tenth Circuit opinion cited by defendant, Welsh v. City of Shawnee, 1999 WL 345597, at *5 (10th Cir. 1999), in which the court refused to permit consideration of a signed but unverified "information sheet" plaintiff filed with the EEOC.  The court stated:

> the formal charges is the key document in getting the Title VII process rolling.  By statute and regulation, it must be in writing, and signed under oath or affirmation, see 42 U.S.C. § 2000e-5(b); 29 C.F.R. § 1601.9, and

18

> it must describe the practices complained of, *see id.* § 1601.12(b).  It
> therefore is the primary, and usually the only, place to which courts look to
> determine whether a plaintiff timely and properly exhausted her claims
> before the EEOC.  Because it is the only document that must be sent to
> the charged party, it is the only document that can satisfy the notice
> requirement.

Welsh, 1999 WL 345597, at *5.  See Green v. Donahoe, 2011 WL 5119001, at * 3 & *5

(D. Colo. Oct. 28, 2011) (Plaintiff failed to exhaust several acts of retaliation excluded

from EEOC charge.  Court refused to consider plaintiff's affidavit submitted to the

EEOC); Bexley v. Dillon Cos., Inc., 2006 WL 650236, at *2 (D. Colo. Mar. 13, 2006)

(Excluded plaintiff's letter submitted to EEOC from the exhaustion inquiry.  "Plaintiff was

required to either amend her EEOC charge or file a second charge to exhaust her

administrative remedies . . . ."); Rogers v. Apria Healthcare, Inc., 2013 WL 3773838, at

*4 (D. Kan. July 17, 2013) (refused to consider unverified and undated letter plaintiff

sent to the EEOC).  These documents were not provided to the defendant, were not

part of the Charges, and did not serve the purpose of providing defendant notice of the

discrimination claims being brought against it.

The court thus agrees with defendant and finds that the acts listed above could

not have reasonably been expected to follow the Charges submitted to the EEOC.

Therefore, such acts were not exhausted and should be dismissed.

**Constructive Discharge Claim**

The Tenth Circuit has defined a constructive discharge as follows:

> A constructive discharge occurs when an employer, through
> unlawful acts, makes working conditions so intolerable that a reasonable
> person in the employee's position would feel forced to resign.  Working
> conditions must be so severe that the plaintiff simply had no choice but to
> quit.  In contrast, a plaintiff who voluntarily resigns cannot claim that he or
> she was constructively discharged.

19

> The question is not whether working conditions at the facility were difficult or unpleasant. . . .  We judge the voluntariness of an employee's resignation under and objective standard, looking to whether his or her working conditions were so intolerable that a reasonable employee would have had no other choice but to quit.

Exum v. U.S. Olympic Comm., 389 F.3d 1130, 1135-36 (10th Cir. 2004).  Furthermore, "the fact that a plaintiff subjectively considers his or her workplace stressful and may have suffered personal health problems as a result is not an objective criterion used to determine if a reasonable employee would have been compelled to resign."  Id. at 1136.  Here, accepting all of Johnston's factual allegations as true, this court does not find that they plausibly approach conditions sufficient to find that her resignation was objectively involuntary.  Therefore, it is recommended that her constructive discharge claim be dismissed.

**Hostile Work Environment Claims**

The court further finds that plaintiffs have also failed to plead facts sufficient to state a plausible claim for harassment based on a hostile work environment.  A hostile work environment is defined as a "workplace . . . permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  MacKenzie v. City & County of Denver, 414 F.3d 1266, 1280 (10th Cir. 2005) (quoting Perry v. Federal Home Loan of Topeka, 155 F.3d 1257, 1261 (10th Cir. 1998)).  "Factors tending to show a hostile work environment are measured in the following terms: '(1) the frequency of the discriminatory conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and

20

(4) whether the conduct unreasonably interferes with the employee's work performance.'" Calvin v. SMG, 2014 WL 321170, at *9 (D. Colo. Jan. 29, 2014) (quoting MacKenzie, 414 F.3d at 1280).  "'[C]ourts judging hostility should filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of . . . jokes, and occasional teasing' as well as 'offhand comments and isolated incidents (unless extremely serious).'" Id. (quoting MacKenzie, 414 F.3d at 1280). "Federal discrimination laws are not to become trivialized as a civility code." Id. (quotations omitted).  Here, the conditions alleged by plaintiffs, accepted as true, considered individually and collectively, do not plausibly approach a workplace "permeated with discriminatory intimidation, ridicule, and insult," MacKenzie, 414 F.3d at 1280, and thus do not state a hostile work environment claim.

**WHEREFORE,** for the foregoing reasons, it is hereby

**RECOMMENDED** that Defendant's Partial Motion to Dismiss Second Amended Complaint and Jury Demand (Docket No. 25) be **granted** as detailed above.

**NOTICE:  Pursuant to 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b)(2), the parties have fourteen (14) days after service of this recommendation to serve and file specific written objections to the above recommendation with the District Judge assigned to the case.  A party may respond to another party's objections within fourteen (14) days after being served with a copy.  The District Judge need not consider frivolous, conclusive, or general objections.  A party's failure to file and serve such written, specific objections waives *de novo* review of the recommendation by the District Judge, Thomas v. Arn, 474 U.S. 140, 148-53**

21

**(1985), and also waives appellate review of both factual and legal questions.**

**<u>Makin v. Colorado Dep't of Corrections</u>, 183 F.3d 1205, 1210 (10th Cir. 1999);**

**<u>Talley v. Hesse</u>, 91 F.3d 1411, 1412-13 (10th Cir. 1996).**


Dated: October 30, 2014                    s/ Michael J. Watanabe
        Denver, Colorado                    Michael J. Watanabe
                                   United States Magistrate Judge